IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CARLOS HALL, SR.                                                    PLAINTIFF

V.                          CASE NO. 4:21CV00106 BSM

ERIC S. HIGGINS                                                    DEFENDANT

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Carlos Hall, Sr. ("Hall") brings claims against Defendant Eric S. Higgins under 42 U.S.C. § 1983, the Arkansas Civil Rights Act ("ACRA"), and the Americans with Disabilities Act ("ADA"), alleging deliberate indifference to medical needs, unconstitutional conditions of confinement, and disability discrimination.

Hall alleges that during his incarceration at the Pulaski County Regional Detention Facility ("PCRDF") in 2019, Higgins failed to provide him with appropriate accommodations and medical care. Specifically, Hall claims he was not provided with handicap-accessible showers or toilets. Hall also claims Higgins failed to provide him with appropriate medical care which resulted in Hall lying in his own waste "for hours on end", developing pressures sores, and sustaining an infection associated with his catheter.

Hall's claims fail for the following reasons: (1) his constitutional rights were not violated by Higgins; (2) even assuming for purposes of summary judgment that a constitutional violation occurred, the alleged violations did not occur pursuant to an unconstitutional custom, policy, or practice of Pulaski County; and (3) Hall was appropriately accommodated during his detention.

1

## STATEMENT OF UNDISPUTED FACTS[1]

### I.      Hall's PCRDF Incarcerations

Hall was booked into the PCRDF on April 11, 2019, and released on May 20, 2019. During the ten years prior to April 2019, Hall had been incarcerated at the PCRDF on approximately 13 occasions. In 2019, prior to his April, 11, 2019 incarceration, Hall was incarcerated at the PCRDF from January 28, 2019, through February 1, 2019, and from March 28, 2019, through March 29, 2019.

### II.     Paralysis and Subsequent Injuries

Hall has been paralyzed from the waist down due to a gunshot wound he suffered in 2012. In 2017, Hall was hit by a truck while seated in his wheelchair. A metal rod was inserted in his hip through his right leg, and a metal cage was placed around his spine. Hall has suffered from chronic back and leg pain since the accident in 2017.

### III.    Pertinent History of Medical Treatment Prior to Hall's April-May 2019 Incarceration

In 1997, Hall was first diagnosed with depression. In late 2006, Hall reported a history of mental health issues, including depression, to personnel at the Arkansas State Hospital. On December 19, 2014, Hall reported to UAMS of having depression for the past two years since the loss of his brother and his gunshot wound in 2012.

On July 22, 2018, Hall was admitted to UAMS due to worsening back pain and was found to have MRSA vertebral osteomyelitis with epidural abscess and E. Coli. UAMS records from Hall's July 22, 2018 admission reflect a history of neurogenic bladder, urinary tract infections, and

---

[1] The Statement of Undisputed Facts is taken directly from Defendant's Statement of Facts Not in Dispute for Purposes of Summary Judgment.

thigh ulcers. On July 25, 2018, Hall underwent spinal fusion surgery, a transforaminal lumbar interbody fusion ("TLIF"), with an autograft bone and abscess drainage at UAMS.

On July 26, 2018, Hall reported to UAMS that "his wife stole his wallet and truck then took off to Memphis," and that he "wanted to leave AMA (against medical advice) to go get them." UAMS also noted Hall "mentioned 'suicide' several times but was not speaking clearly so that was the only word we could differentiate." The on-call resident convinced Hall to remain at UAMS, and the police were called to report his stolen wallet. Psychiatry was also consulted for determination of Hall's capacity.

On July 27, 2018, Hall received a physical therapy evaluation by UAMS to assess his discharge needs following his surgical procedure. Hall's active medical problem list at that time included neurogenic bladder, presence of indwelling urethral catheter, staphylococcus aureus bacteremia, and hypertension. The provider noted, "P[a]t[ient] with multiple recent admits and left AMA (against medical advice) each time." Hall's admission chart indicated a positive drug screen for cocaine, PCP, and benzodiazepines.

On July 29, 2018, Hall left UAMS against medical advice. The provider advised Hall of the risks associated with leaving against medical advice, including the "inability to provide adequate treatment for current infections."

On August 4, 2018, Hall returned to UAMS for worsening back pain and was admitted due to MRSA vertebral osteomyelitis with epidural abscess, noted to be incompletely treated due to Hall's noncompliance with antibiotics. Progress notes dated August 7, 2018, indicate the provider "[t]ried to convince him regarding the need for taking IV antibiotic for 6 weeks and [Hall] hopes he can be compliant with home health this time." On August 8, 2018, UAMS spoke with Hall's

wife regarding Hall's discharge plans and asked Hall's wife about prior IV care at home. Hall's wife stated, "he would not stay at the house and was not compliant with the medication."

On August 8, 2018, while still at UAMS, Hall received a peripherally-inserted central catheter ("PICC") line placement due to bacteremia. On August 10, 2018, Hall complained to UAMS of severe pain and received Oxycodone. Hall advised UAMS that the medication "is not going to do anything for him," and the provider indicated they "will not be prescribing IV morphine for p[a]t[ient]." Hall stated he "will leave and go to another facility," and was then discharged home.

On August 17, 2018, Hall presented to ARcare Little Rock Primary Care Clinic and was diagnosed, in part, with a staph infection, pressure ulcer of the right buttock, and long-term use of antibiotics.

On January 4, 2019, Hall was treated by UAMS for recurrent MRSA and vertebral osteomyelitis. UAMS noted Hall was previously discharged from UAMS following his surgical procedure on antibiotics to be taken until January 20, 2019, but Hall was terminated from Home Health on January 2, 2019 due to noncompliance and safety concerns. UAMS prescribed Hall antibiotics to be taken for six months.

On January 5, 2019, Hall was treated by UAMS for paranoia following cocaine abuse. Hall's drug screen was positive for cocaine and PCP, and UAMS noted Hall's urinalysis appeared to be indicative of a urinary tract infection. Hall was discharged and no medications were prescribed, as he was already taking antibiotics.

On January 10, 2019, UAMS attempted to contact Hall to schedule removal of his PICC line and to start him on Doxycycline. The record notes, "At this point we have tried multiple different avenues on multiple different occasions to get a hold of Mr. Hall. If Mr. Hall presents for

care for another purpose, our plan is to ensure PICC line has been removed and for him to take Doxycycline for at least 6 months for refractory MRSA."

On January 24, 2019, Hall returned to UAMS for surgical follow up related to his prior spinal procedure and was noted to have MRSA bacteremia and worsening lower-back pain.

On February 25, 2019, Hall was admitted to UAMS for a urinary tract infection related to his catheter. UAMS noted Hall had a history of MRSA bacteremia from June 2018 complicated by right elbow septic arthritis, left-elbow bursitis, and vertebral osteomyelitis with epidural abscess following his laminectomy and TLIF with auto-bone graft procedure, as well as a history of hardware infections and recurrent urinary tract infections. Upon assessment, Hall was noted to have a fissure to the gluteal cleft and pressure injury to the right ankle. UAMS provided treatment and planned for Hall to continue antibiotics and scheduled for Hall to have his sutures removed from prior back surgery.

On March 4, 2019, Hall was seen by UAMS for worsening back pain relating to his spinal surgery in July 2018. During this visit, Hall reported that he had been homeless and living in his vehicle for the last four days, and that this had exacerbated his back pain. Hall had not seen his Home Health Nurse since losing his home. On exam, Hall was found to have an ulcer over the right lateral malleolus, right thigh, and right hip. UAMS noted that none of the ulcers appeared acutely infected.

On March 28, 2019, Hall presented to UAMS in police custody related to a DUI arrest. Hall was in need of a catheter replacement. UAMS noted it was unclear how or when Hall's catheter became dislodged. His catheter site was without evidence of infection, and his catheter was replaced. He was booked into PCRDF after his discharge from UAMS on March 28, 2019, and released from PCRDF the next day on March 29, 2019.

On April 7, 2019, Hall presented to UAMS for catheter leakage that began after his catheter replacement with UAMS on March 28, 2019. UAMS noted Hall's catheter had been replaced with a silicon catheter, and Hall complained of being allergic to silicon. Hall also complained that the replacement catheter was too small. UAMS found no rash or pallor to his skin and treated Hall by flushing his Foley tubing and starting him on an antibiotic.

**IV.     PCRDF Policies and Hall's April-May 2019 Incarceration**

On April 11, 2019, Hall was booked into PCRDF. When a person is booked into PCRDF, he or she goes through an intake medical screening performed by qualified healthcare personnel. Pulaski County has policies and guidelines in place to ensure the provision of healthcare services to individuals confined at PCRDF. All deputies at PCRDF receive training, including but not limited to:  administration of first aid; recognizing disabling conditions; methods of obtaining medical assistance; and referring inmates to health professionals.

The PCSO contracts with Turn Key to provide medical services to the inmates at the PCRDF which encompasses paraplegic care in the event of a medical need. As the medical provider, Turn Key has policies and practices in place to obtain and dispense medication. During the intake medical screening, Turn Key medical personnel ask detainees about illnesses, health problems, medications, and special health requirements. Each detainee is assessed by medical during the intake screening to determine if they meet special needs criteria, which includes physical disabilities.

The PCSO maintains a policy on accommodations for disabled inmates. PCSO Branch Directive D10-00040. Further, as stated by Higgins, PCRDF has accessible cells and does everything it can for inmates "with special needs when they come into the facility."

Inmates at PCRDF may submit grievances and PCRDF maintains a grievance policy. Grievances that address medical issues are forwarded to the Medical Section. If numerous grievances are submitted on the same subject, PCRDF staff are only required to investigate and respond to the first grievance submitted.

Hall's intake screening report was completed on April 11, 2019, by Tina Moore ("Moore"), a Turn Key employee. During intake, Hall reported no injuries and that his last healthcare visit was at UAMS two days' prior. The intake screening report completed by Turn Key indicated Hall required a wheelchair and a catheter, which he had in his possession during intake. The wheelchair Hall arrived in was a manual wheelchair with a vinyl or leather seat. The wheelchair, however, allowed Hall's leg to drag on the ground. PCRDF provided Hall with another manual wheelchair that supported both of Hall's legs.

Prior to Hall's detention at PCRDF, Hall was prescribed an electric wheelchair and special cushioning. The prescription wheelchair and prescription cushioning, however, were too heavy to transport from Hall's residence, weighing approximately 350 pounds and requiring a lift vehicle for transportation.

Upon intake, Turn Key verified the medications Hall reported taking at that time, which included gabapentin, hydrocodone, baclofen, aripiprazole, and hydrochlorothiazide. Due to Hall's disabilities, Moore recommended that Hall be placed in lower-level housing and in a lower bunk. Moore did not physically examine Hall for bedsores, but Turn Key's practice during the intake process is to ask detainees whether there are "any wound or sores we need to look at." Hall was placed on medical administrative segregation because he was in a wheelchair.

On April 12, 2019, at 12:00 p.m., Hall reported having catheter leakage to PCRDF Deputy Jamie Ledford, who contacted medical to assess Hall. Turn Key employee Amanda Holt ("Holt") responded thereafter to assess Hall and noted there was no redness at the catheter site.

On April 12, 2019, at 7:45 p.m., Hall told PCRDF Deputy Michael Peery he could not breathe and complained of chest pain. Deputy Peery noted Hall's speech appeared more slurred compared to his previous encounter with Hall and contacted central control to request that medical report to the unit. Turn Key Nurse Deborah Russell ("Russell") responded to assess Hall, and as Russell was assessing Hall, Deputy Peery witnessed Hall become limp, slouch over, and fall to the floor from his wheelchair. Deputy Peery then called a Code Red at 7:52 p.m. Other medical personnel responded and assessed Hall. Hall was cleared to remain in the unit with vital checks every 30 minutes. Turn Key records also indicate on this day that Hall was allowed to have an extra mattress.

On April 13, 2019, Hall was assessed for chest pain and received medication orders for Clonidine (medication for high blood pressure), Nitroglycerin (medication for chest pain), Amlodipine (Abilify; antipsychotic medication), Aspirin, and Metoprolol (medication for high blood pressure and chest pain).

On April 14, 2019, Hall requested medical to transfer him to a different unit, specifically, the unit where he was housed "last time," where he could more easily shower.

On April 15, 2019 Turn Key employee Mallory Mannis ("Mannis") was called to the unit to assessed Hall because of a leaking catheter. Mannis noted there was no redness, swelling, or infection at the catheter site. Mannis also noted that Hall requested Gabapentin, and Mannis advised Hall that Gabapentin was a non-formulary drug that would need to be prescribed by a doctor. That same day, Hall was examined by APRN Kendra Roberts ("Roberts") of Turn Key.

Roberts reported that Hall had no rash or lesions on his skin. From this exam, Roberts requested that Hall be sent to UAMS for evaluation of his catheter, and Hall was transported to UAMS the same day.

While at UAMS on April 15, 2019, Hall agreed that he had been noncompliant with his prior UAMS prescription of Doxycycline, stating he only took it for one month. He also reported having persistent urinary leakage since receiving a replacement catheter from UAMS a few weeks prior (i.e., March 28, 2019) with a tube that he believed was too small. Hall also complained to UAMS of not receiving Gabapentin while in jail, and UAMS noted Hall had a history of drug-seeking behavior and a history of noncompliance with treatment. UAMS noted that during his exam, Hall "was frustrated with the prelim[inary] rec[ommendation] by [the] [neurosurgery] resident [that] he would not need surgery, [his] pain[,] and [a] lack of . . . perceived cooperation from hospital staff."

 UAMS performed a CT scan of his abdomen, and the results were consistent with chronic cystitis which was treated with Ceftriaxone. Hall received multiple doses of pain medication and changing of his catheter tube for treatment. Hall's neurological exam was stable, and he was not in acute distress. UAMS determined Hall's prior fall on April 12, 2019 did not cause any exacerbation of his bowel and bladder incontinence. A CT of Hall's spine, abdomen, and pelvis performed on admission showed no new findings of infection or abscess, and UAMS noted there was no indication for any neurosurgical intervention. Hall's UAMS discharge exam showed no ulcers, skin rashes, skin breaks, or tears.

Upon discharge from UAMS, Hall was diagnosed with acute exacerbation of chronic back pain, catheter cystitis, iron deficiency anemia, hypertension, and schizophrenia. Hall was

prescribed docusate sodium (Colace), ferrous sulfate (iron supplement), and sulfamethoxazole-TMP (sulfamethoxazole and trimethoprim; antibiotic).

On April 18, 2019, Hall returned from UAMS and again underwent medical intake screening, which was completed by Turn Key employee Shantrell Gibson ("Gibson"). Hall showed no signs of, or made reports of, any injury, and Gibson recommended that Hall be placed in lower-level housing with a lower bunk and for Hall to receive a routine provider referral with respect to continuity of care. When Hall returned from UAMS on April 18, 2019, he was transferred from U-Unit to W-Unit, as he had requested on April 14, 2019. The same day that he returned to PCRDF from UAMS, Hall submitted a sick call request to medical complaining of back pain, but Hall refused to be seen by Turn Key Nurse Angela Hopton.

On April 19, 2019, Turn Key employee Tabitha McCauley ("McCauley") encountered Hall due to his complaints of heartburn. McCauley noted that Hall complained about not having Gabapentin and Oxycodone and advised Hall she could only provide him the medications prescribed by the doctor.

On April 20, 2019, Hall refused to see medical. Turn Key records with respect to Hall's refusal to be seen on April 20, 2019, note that Hall "refused to sign, refused protocol - only wanted his pain meds. [Inmate] referred to provider."

On April 21, 2019, Hall submitted a sick call request complaining of back, leg, chest, and foot pain. Turn Key notes reflect Hall refused to be seen by medical.

On April 22, 2019, Hall submitted another sick call request complaining of back, leg, and foot pain, high blood pressure, and sleep issues. Turn Key notes reflect that Hall refused to be seen by medical.

On April 22, 2019, Hall refused his medication doses of Norvasc (Amlodipine; medication for high blood pressure), Abilify (Aripiprazole; antipsychotic medication), MiraLAX (Polyethylene Glycol; laxative), and Ferrous Sulfate (iron supplement).

On April 23, 2019, Hall submitted a sick call request stating that he missed his medical assessment with Turn Key on the previous day due to being evaluated by an outside provider. He complained of back, chest, and leg pain. That same day, Hall was seen by Turn Key employee Hannah Weatherly ("Weatherly") for complaints of chest and back pain and was cleared to remain in the unit. Weatherly noted Hall stated his "pain is from sitting in [an] unfit wheelchair and with no proper bedding." Hall was allowed to receive an extra mattress. On this date, Hall refused his medication doses prescribed to him for the following: Norvasc (Amlodipine; medication for high blood pressure), Abilify (Aripiprazole; antipsychotic medication), MiraLAX (Polyethylene Glycol; laxative), and Ferrous Sulfate (iron supplement).

On April 24, 2019, Hall submitted two sick call requests. In one, he complained of pain in his chest, back, right leg, and both feet. Turn Key responded the following day on April 25, 2019, and noted that Hall had seen the provider and "she has done all she can for you. We are giving you everything we can at this time." In Hall's second sick call request on April 24, 2019, Hall reported pain, bedsores, chest pain, and a leaking catheter bag. On April 26, 2019, Turn Key responded and noted that Hall was tearful and anxious. On April 27, 2019, Turn Key noted Hall refused to be seen by medical. Hall also refused his medication dose of Norvasc (Amlodipine; medication for high blood pressure).

On April 24, 2019, Hall was prescribed, among other things, Sulfa/Trimeth (sulfamethoxazole and trimethoprim), an antibiotic used to treat infections.

This same date, a mental health professional of Turn Key attempted to speak with Hall, but Hall refused and stated, "The only mental health I want to talk to is the doctor." The mental health professional advised Hall of how to access mental health services should the need arise.

On April 25, 2019, Hall was seen by Roberts of Turn Key for a follow-up appointment due to his recent hospitalization at UAMS. UAMS recommended for Hall to start Doxycycline, and the records indicate he was prescribed Doxycycline on April 25, 2019. Roberts noted Hall complained of pain and that his clothes were soiled.

On April 27, 2019, a mental health professional of Turn Key attempted to see Hall regarding his report of sleep issues. Hall "refused to get up and told the unity deputy that [the mental health provider] can come to his bunk," and the mental health provider advised the deputy she would not go to Hall's bunk and for Hall to submit another sick call if he would not come to the unit floor.

On April 29, 2019, Hall refused his medication dose of MiraLAX (Polyethylene Glycol; laxative).

Turn Key records from April 30, 2019, indicate Hall was to be seen by a mental health provider for anxiety. "Inmate told the deputy he is in a wheelchair and his back hurts, and [he] asked if [the mental health provider] could come to his bunk. [The mental health provider] advised [she] will not go to his sleeping quarter to discuss confidential matters. Inmate can submit another sick call." On this date, Hall refused doses of the following medications prescribed to him: Lopressor (Metoprolol Tartrate; medication for high blood pressure and chest pain), Robaxin (Methocarbamol; muscle relaxant), Doxycycline (antibiotic), Gabapentin (Neurontin; medication for neuropathic pain), Naproxen (pain reliever), Norvasc (Amlodipine; medication for high blood

pressure), Abilify (Aripiprazole; antipsychotic medication), MiraLAX (Polyethylene Glycol; laxative), and Ferrous Sulfate (iron supplement).

On May 1, 2019, Hall submitted a sick call request complaining of pain in his back, chest, and leg, and Turn Key notes reflect that Hall refused medical attention at the time Turn Key attempted to see Hall concerning his sick call request. Hall was later examined by Roberts on May 1, 2019, during which time Hall requested a prescription for Gabapentin. Roberts submitted a medication request for Gabapentin for Hall to take for 90 days.

On May 2, 2019, Hall refused doses of the following medications prescribed to him: Gabapentin (Neurontin; medication for neuropathic pain), Lopressor (Metoprolol Tartrate; medication for high blood pressure and chest pain), Robaxin (Methocarbamol; muscle relaxant), Doxycycline (antibiotic), Norvasc (Amlodipine; medication for high blood pressure), Abilify (Aripiprazole; antipsychotic medication), MiraLAX (Polyethylene Glycol; laxative), and Ferrous Sulfate (iron supplement). Hall also reported to medical on this date but "decided he did not want to wait to be seen."

On May 4, 2019, Hall reported to Turn Key that he was experiencing pain in the center of his chest. Turn Key notified Dr. Absalom Tilley, Turn Key Medical Director, who advised to have Hall transported to UAMS. At UAMS, Hall reported bilateral foot pain, chest pain, and multiple pressure ulcers. During Hall's exam at UAMS on May 4, 2019, the UAMS provider noted Hall's skin was "warm and dry" and had "no rash." Further, there was "no noted sacral decubitus [pressure sores] no obvious breakdown observed."

Hall was discharged from UAMS on May 5, 2019. UAMS diagnosed Hall with chest pain, unspecified type; chronic neuropathic pain; and lower extremity edema. Hall returned to PCRDF and was again assessed by Turn Key. No injuries were reported.

On May 9, 2019, Hall submitted two sick call requests. In one, he complained of swollen feet and legs. Turn Key replaced Hall's TED hose (compression stockings) on May 12, 2019, noting that it was replaced due to Hall's prior compression stockings being left at UAMS. In the other sick call submitted on May 9, 2019, Hall complained of depression and "not getting proper treatment physically." Turn Key responded on May 10, 2019 that he was scheduled for a follow-up appointment with psychiatry the week of May 17, 2019. Hall refused doses of the following medications prescribed to him on this date: Gabapentin (Neurontin; medication for neuropathic pain), Norvasc (Amlodipine; medication for high blood pressure), Abilify (Aripiprazole; antipsychotic medication), Doxycycline (antibiotic), Ferrous Sulfate (iron supplement), MiraLAX (Polyethylene Glycol; laxative), Lopressor (Metoprolol Tartrate; medication for high blood pressure and chest pain), Robaxin (Methocarbamol; muscle relaxant), and Naproxen (pain reliever).

On May 10, 2019, UAMS contacted PCRDF and advised that Hall needed to be seen at UAMS in July of 2019.

On May 10, 2019, a mental health professional of Turn Key met with Hall, and Hall reported physical pain and depression and complained that he had not yet received all of his medications.

On May 15, 2019, Hall reported sharp, stabbing pain in his spine and under his left breast to medical. Hall's vitals were assessed and he received an antacid and was counseled to eat small meals and chew slowly.

On May 16, 2019, at 10:23 a.m., Dr. Tilley examined Hall due to his medical complaints on the previous day, at which time Hall reported chest pain from the previous night and current hip pain from a prior fall. Dr. Tilley noted that Hall had no rashes or lesions on his skin and ordered

an x-ray of Hall's right hip. An x-ray was ordered for Hall's right hip, and follow-up care was scheduled for one month out. On May 16, 2019, at 7:05 p.m., Hall reported severe chest pain to PCRDF Deputy Hill, and Deputy Hill contacted medical to report to the unit. Turn Key Nurse Turks arrived thereafter and assessed and cleared Hall to remain in the unit.

On May 17, 2019, Hall was assessed by a mental health professional of Turn Key who noted Hall "continued to experience depression." Records indicate Hall was to take mental health medications and attend a follow-up psychiatry appointment in 90 days.

On May 18, 2019, Hall submitted a sick call request complaining of catheter leakage, and Turn Key responded the following day and stated, "You have been referred to the provider."

Throughout his detention at PCRDF, Hall submitted multiple grievances. These grievances were received on April 25, 2019, May 6, 2019, May 14, 2019, May 20, 2019, and May 21, 2019. PCRDF staff responded to Hall's grievances and, when appropriate, referred the grievance to medical staff. Throughout the time period of these grievances, Hall was consistently monitored by medical personnel and PCRDF staff.

On May 20, 2019, Hall was released from PCRDF to Little Rock District Court and did not return.

Hall stated he does not remember the names of any deputies or nurses he interacted with during his incarceration from April 11, 2019, to May 20, 2019.

**V.  Accessible Housing**

In addition to paraplegia, Hall suffers from both bladder and bowel incontinence. For his bladder incontinence, Hall relies on a catheter and ostomy bag. He empties his ostomy bag approximately every other day. For his bowel incontinence, Hall relies on diapers. During his detention at PCRDF, Hall was housed in the U-Unit and W-Unit. From April 11, 2019, to April

18, 2019, Hall was housed in the U-Unit. From April 20, 2019, to May 11, 2019, Hall was housed

in the W-Unit, specifically W-3-2 (W-3 Unit West). From May 11, 2019, to May 18, 2019, Hall

was housed in the W-Unit, specifically W-1-1 (W-1 Unit West). Individuals housed in the U-Unit

have handicap-accessible showers, but not handicap-accessible toilets. Individuals housed in the

W-Unit, including W-3 Unit West and W-1 Unit West, have handicap-accessible showers and

handrails. Individuals housed in W-3 Unit West have handicap-accessible toilets, but individuals

housed in W-1 Unit West do not. During his detention, Hall was assigned to a lower bunk.

**ARGUMENT**

I.        **Summary Judgment Standard**

This Court must grant summary judgment "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, shows that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Ark. R. Civ. P. 56(c)(2). "Once the moving party has established a *prima facie* entitlement

to summary judgment, the opposing party must meet proof with proof and demonstrate the

existence of a material issue of fact." *Dunaway v. Garland Cnty. Fair & Livestock Show Ass'n,

Inc.*, 97 Ark. App. 181, 188 (2006) (quoting *Crooked Creek, III, Inc. v. City of Greenwood*, 352

Ark. 465, 469-70 (2003)).  "Summary judgment is appropriate when there are no genuine issues

of material fact, and the moving party is entitled to judgment as a matter of law." *Lacy v. Flake &

Kelley Mgmt., Inc.*, 366 Ark. 365, 367 (2006).

II.       **Official Capacity Claims**

A.        **Deliberate Indifference to Medical Needs**

Hall maintains Higgins, in his official capacity, failed to provide him with constitutionally

adequate medical care during his detention at PCRDF in April and May of 2019. A suit against a

16

public official in his or her official capacity is a suit against the official's office. *See Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007); *see also City of Marianna v. Ark. Mun. League*, 291 Ark. 74, 722 S.W.2d 578 (1987). Therefore, Hall's claim is against Pulaski County. Hall brings this claim under the ACRA (Ark. Code Ann. 16-123-105(a)) and 42 U.S.C. § 1983. When construing Ark. Code Ann. 16-123-105(a), courts may look for guidance to state and federal decisions interpreting 42 U.S.C. § 1983. Ark. Code Ann. § 16-123-105(c).

The Eighth Circuit analyzes claims involving denial of adequate medical care under the deliberate indifference standard of the Eighth Amendment. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006). To establish a claim of deliberate indifference to a medical need, a plaintiff must demonstrate (1) "that he suffered from an objectively serious medical need"; and (2) "that prison officials actually knew of, but deliberately disregarded, that need." *Meuir v. Greene County Jail Emples.*, 487 F.3d 1115, 1118 (8th Cir. 2007).

Hall's claims against Higgins in his official capacity are only sustainable where a constitutional violation occurred pursuant to an official custom, policy, or practice at PCRDF. *Luckert v. Dodge County*, 684 F.3d 808, 820 (8th Cir. 2012) (quoting *Johnson v. Blaukat*, 433 F.3d 1108, 1114 (8th Cir. 2006)). "And this custom, policy, or practice must be the 'moving force' behind the violation." *Id*. (quoting *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985)). Moreover, there must be an "affirmative link" or "causal connection" between the policy and the particular constitutional violation alleged. *See Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987). "There are two basic circumstances under which [county] liability will attach: (1) where a particular [county] policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful [county] policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009).

Hall's official capacity claim fails because there is no underlying constitutional violation. In his Amended Complaint, it appears Hall maintains Pulaski County was deliberately indifferent to three medical needs: (1) Hall's bowel and urinary incontinence; (2) Hall's pressure sores; and (3) an infection related to Hall's catheter. Even if each of these medical needs was objectively serious, which Higgins does not admit, there is no evidence of PCRDF staff knowing of the objectively serious medical need and deliberately disregarding that need.

With respect to Hall's claim that Pulaski County allowed him to sit for hours in his own waste, the record does not support the claim. The record demonstrates Hall was seen by medical professionals or PCRDF staff every day of his detention at PCRDF. PCRDF deputies are assigned to each unit of PCRDF. Therefore, Hall likely had daily interactions with PCRDF staff. Hall was seen by Turn Key medical staff on April 12, 2019 (two times), April 13, 2019, April 15, 2019 (two times), April 18, 2019, April 19, 2019, April 23, 2019, April 25, 2019, April 26, 2019, May 1, 2019, May 5, 2019, May 10, 2019, May 12, 2019, May 15, 2019, May 16, 2019 (two times), and May 17, 2019. At the direction of Turn Key medical staff, Hall was also assessed and treated by UAMS on April 15, 2019 – April 18, 2019, and May 4, 2019 – May 5, 2019. Turn Key medical staff attempted to assess Hall on numerous dates, but Hall refused care. Hall's refusals occurred on April 18, 2019, April 20, 2019, April 21, 2019, April 22, 2019, April 24, 2019, April 27, 2019, May 1, 2019, and May 2, 2019. Importantly, within the Turn Key medical records there is only one note indicating Hall had soiled clothing. *See* Turn Key Records, p. 32. If Hall was indeed allowed to sit for hours in his own waste, there would likely be records addressing that issue. And yet, there are not.

The need for a diaper change is not an objectively serious medical need. A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment, or one that is so

obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). A soiled diaper, while uncomfortable, is not a serious medical need.

Further, while Hall submitted grievances related to bowel incontinence (*see* May 14, 2019 Grievance #1, May 14, 2019 Grievance #2, and May 20, 2019 Grievance #3), those grievances were received by PCRDF staff on May 14 and May 20, 2019, days before Hall's discharge from PCRDF on May 20, 2019. And, PCRDF responded to the grievances. Specifically, PCRDF Sgt. Musaddiq went to Hall's unit, "listened to [Hall's] concerns" and provided Hall with a taller shower chair. Hall was told to notify PCRDF deputies if he had "any problems with showering or just daily tasks." There is no evidence PCRDF staff deliberately disregarded Hall's needs with respect to his bowel incontinence.

As to Hall's claim of pressure sores, the records contain no evidence Hall suffered from pressure sores during his detention at PCRDF. Hall alleges he developed pressure sores on his buttocks because PCRDF staff did not turn him or "conduct daily checks of his skin integrity." ECF 4, Am. Compl. at ¶ 6. Hall also cites the manual wheelchair as a cause of his pressure sores. In his deposition, Hall stated he developed pressure sores "two weeks after" his admission to PCRDF in April 2019. However, the record demonstrates Hall was seen by Turn Key almost daily during his incarceration and did not have a need for intervention for pressure sores. He was assessed specifically for pressure sores on multiple occasions:

- On April 11, 2019, when he was assessed at intake, Hall was asked whether there were "any wound[s] or sores we need to look at." Moore Deposition, p. 16. None were noted.

- On April 15, 2019, Hall was examined by APRN Kendra Roberts of Turn Key, and Ms. Roberts reported Hall had no rash or lesions on his skin. Turn Key Records, pp. 23, 27.

- On April 17, 2019, Hall's discharge exam at UAMS showed no ulcers, skin rashes, skin breaks, or tears. UAMS Records, pp. 57-58.

- On May 4, 2019, Hall was again examined at UAMS and the medical provider noted Hall's skin was "warm and dry" and had "no rash" and that there was "no noted sacral decubitus [pressure sores] no obvious breakdown observed." *Id.* at pp. 72-73.

- On May 9, 2019, Hall complained of pressure sores, but on May 16, 2019, Dr. Tilley's exam of Hall noted that he had no rashes or lesions on his skin. Turn Key Records, p. 56.

The first time a diagnosis for pressure sores appears in Hall's medical records is on August 7, 2019, more than two months following Hall's release from PCRDF. UAMS records dated August 7, 2019, indicate Hall's skin condition was warm and dry with "decubitus to sacrum." UAMS Records, p. 64. The records demonstrate Hall did not suffer from pressure sores during his detention at PCRDF. As such, with respect to bedsores, there was no serious medical condition.

The records also indicate Turn Key staff were alert to issues related to Hall's catheter and treated Hall accordingly. On April 11, 2019, Hall reported catheter leakage and was assessed by a Turn Key employee who noted no redness at the catheter site. Four days later, on April 15, 2019, Hall was again assessed by a Turn Key employee and the employee noted potential infection and requested Hall be transported to UAMS. UAMS assessed and treated Hall for four days. Following his treatment at UAMS, Hall was prescribed sulfamethoxazole and trimethoprim (antibiotic) and doxycycline (antibiotic). On April 26, 2019, a Turn Key employee responded to Hall following his request regarding, among other things, a leaking catheter bag. Notably, on May 4, 2019, Hall was transported to UAMS regarding unrelated issues. UAMS records do not note any infection associated with Hall's catheter. On May 18, 2019, two days before his release from PCRDF, Hall reported catheter leakage. He was referred to the medical provider. The records demonstrate PCRDF was aware of Hall's medical issues related to his catheter and responded appropriately.

Further, to the extent Hall suffered from an infection, the records show prior to Hall's detention at PCRDF, he suffered from recurrent infections that were not properly treated due to noncompliance.

There was no violation of Hall's constitutional rights with respect to his incontinence, alleged pressure sores, or infection related to his catheter. Accordingly, his claims of deliberate indifference to his medical needs fails.

Even if the facts established a constitutional violation, Hall's claim is unsuccessful because any constitutional violation Hall allegedly suffered did not occur pursuant to official custom, policy, or practice of Pulaski County. Hall alleges Pulaski County "had a policy or custom of incarcerating persons like [himself] without training his jailers on perinatal[2] care or contracting with a medical provider to provide perinatal care." ECF 4, Am. Compl. at ¶ 16. However, the undisputed facts show that Pulaski County had policies and guidelines in place to ensure the provision of healthcare services to individuals like Hall confined at PCRDF. PCSO Branch Directive D10-0001. The PCSO contracts with Turn Key to provide medical services to the inmates at the PCRDF, including paraplegic care. Clark Affidavit ¶ 7. Turn Key's medical director, Dr. Absalom Tilley, testified that Turn Key provides "individualized" plans of care based on the needs of each inmate. Deposition of Absalom Tilley ("Tilley Deposition"), pp. 21-22; 27. In addition, Pulaski County policy requires all deputies to be trained in recognizing disabling conditions, methods of obtaining medical assistance, and referring inmates to health professionals. PCSO Branch Directive D10-0042.

PCRDF followed these constitutional policies. During Hall's intake proceeding, Turn Key confirmed that Hall had a catheter and a wheelchair to meet his immediate needs. Turn Key

---

[2] Plaintiff references "perinatal care" throughout the Amended Complaint. "Perinatal", however, is defined as "occurring in, concerned with, or being in the period around the time of birth." "perinatal." *Merriam-Webster.com*. 2022. https://www.merriam-webster.com (5 May 2022). As such, Defendant believes Plaintiff mistakenly references "perinatal care" and actually means to reference "paraplegic care."

Records, p. 12. Hall was also assigned to lower-level housing and in a lower bunk. *Id.* at pp. 13-14; Moore Deposition, p. 7. Later, when Hall requested to be transferred to a unit "where he could more easily shower," his request was granted. April 14, 2019 Medical Inmate Request Form. When Hall complained that he had difficulty transferring to the shower chair in the unit shower, a PCRDF sergeant assisted him by replacing the handicap accessible chair in the shower area with an adjustable chair so that it could be raised to the height of Hall's wheelchair. May 12, 2019 Grievance; Hall Deposition, Vol. 2, pp. 72-73.

Hall's records at PCRDF, compiled by PCRDF deputies and Turn Key employees, show that Pulaski County had policies in place to ensure that Hall's medical needs were addressed. With respect to his incarceration at PCRDF, Hall cannot point to any "any officially accepted guiding principle or procedure that was constitutionally inadequate." *Jenkins v. County of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009). Even if it were true that Hall received inadequate care, merely alleging that procedures were not followed or were inadequate in some way is insufficient. *Id*. Hall is unable to point to a "deliberate choice of a guiding principle or procedure made by the [county] official who has final authority in such matters." *Id*. As a result, his official capacity claims against Pulaski County must be dismissed.

Finally, Hall alleges that it was deliberate indifference "to place a person . . . with [his] disabilities in Pulaski County Regional Detention Facility." ECF 4, Am. Compl. at ¶ 15. However, a policy of placing a person with disabilities in a county jail is not *per se* deliberate indifference. *See Winters v. Ark. HHS*, 437 F. Supp. 2d 851, 899 (E.D. Ark. 2006) ("[N]ot every disability incident to incarceration amounts to 'punishment.'"). Rather, Hall is required to point to a specific policy or custom of Pulaski County that was deliberately indifferent. *See Moyle*, 571 F.3d at 817-18. Hall fails to do so.

Hall's claims of deliberate indifference to a medical need fail as a matter of law under 42 U.S.C. § 1983 and the ACRA. Summary judgment is appropriate.

### B.       Conditions of Confinement

It appears Hall claims the conditions of his confinement were unconstitutional because he was not provided handicap-accessible toilets or showers. Like a claim for deliberate indifference to medical needs, a claim of unconstitutional conditions of confinement is analyzed under the deliberate indifference standard.

> To state a claim for unconstitutional prison conditions, a pretrial detainee must show that (1) the conditions of confinement posed a substantial risk of serious harm and (2) that the prison official knew of but disregarded, or were deliberately indifferent to, plaintiff's health and safety. *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005); *see Hott v. Hennepin County, Minn.*, 260 F.3d 901, 905 (8th Cir. 2001) (applying deliberate indifference standard to pretrial detainee's conditions-of-confinement claim).

*Headrick v. Steph*, 2019 U.S. Dist. LEXIS 118842, *12 (E.D. Mo. July 17, 2019). Furthermore, because Hall makes his claim against Higgins in Higgins's official capacity, the alleged constitutional violation must occur pursuant to an official custom, policy, or practice at PCRDF. *Luckert v. Dodge County*, 684 F.3d 808, 820 (8th Cir. 2012) (quoting *Johnson v. Blaukat*, 433 F.3d 1108, 1114 (8th Cir. 2006)).

With regard to Hall's allegation involving in accessible showers, there was no risk of substantial harm because Hall maintained access to handicap-accessible showers. Throughout his detention at PCRDF, Hall was housed in U-Unit and W-Unit. As stated by Matthew Arivette, a lieutenant in Housing and Security at PCRDF, both U-Unit and W-Unit have handicap-accessible showers. Ultimately, based on the records, it appears Hall had issues using the shower chair in the handicap-accessible shower. PCRDF, however, was made aware of the issue and remedied it. As stated in PCRDF's response to Hall's May 14, 2019 Grievance #1, "If you have problems with showering or just daily tasks, please let the deputy know so Medical can be notified and they will

assist you." There was no risk of substantial harm and, even if there was, PCRDF was proactive and not deliberately indifferent.

There were times when Hall was housed in a unit that did not have handicap-accessible toilets. From April 11, 2019 to April 18, 2019, Hall was housed in U-Unit. U-Unit does not have handicap-accessible toilets. From May 11, 2019 to May 18, 2019, Hall was housed in W-1-1 (W-Unit West). W-Unit West does not have handicap-accessible toilets. This, however, did not pose a substantial risk of serious harm. Hall is incontinent of both bowel and bladder. In his deposition, Hall stated he uses a catheter and ostomy bag for urinary incontinence and relies on diapers for bowel incontinence. The ostomy bag needs emptying every every other day. A diaper, once used, is removed and thrown away. Hall's use of toileting facilities, if any, was minimal. In contrast his shower access, Hall never complained about toilet access. This is likely because Hall did not make use of toileting facilities. To the extent Hall needed handicap-toilet access, he was provided such during the majority of his detention at PCRDF. The failure to provide handicap-accessible toilets during a portion of Hall's detention (14 days of an approximate 40-day detention) was, if anything, negligent. A reasonable officer may believe Hall did not need toilet access due to his use of a catheter and ostomy bag and diapers. There is no evidence PCRDF staff intentionally disregarded or were deliberately indifferent to Hall's need for handicap-accessible toilets. Negligence is insufficient to establish a section 1983 violation. *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005).

Although unclear, it appears Hall may also claim that PCRDF's alleged failure to change his diapers constituted an unlawful condition of confinement. Again, there is no evidence in the voluminous records that Hall was allowed to sit for hours in his own waste. Furthermore, it is undisputed that Hall had access to handicap-accessible showers and was able to use those showers

on his own. PCRDF staff met with Hall to ensure that he was able to use the showering facilities. Hall had the ability to clean himself after bowel movements.

Further, to the extent Hall successfully asserts a constitutional violation related to his conditions of confinement, any violation was not the result of an unconstitutional custom, policy, or practice of PCRDF. Pulaski County has policies in place to provide accessible housing for inmates who need accessible accommodations. Deposition of Eric Higgins ("Higgins Deposition"), pp. 9-10 (stating that PCRDF has accessible cells and does everything it can for inmates "with special needs when they come into the facility"); PCSO Branch Directive D10-00040. Hall was housed in units during his incarceration equipped with accessible showers with handrails. Arivette Affidavit ¶¶ 9, 11. During the majority of Hall's detention, he was placed in cells with accessible toilets. To the extent Hall was placed in units that lacked handicap-accessible toilets, such placement was not done in accordance with PCRDF policies.

Hall's claims of unlawful conditions of confinement fail as a matter of law under 42 U.S.C. § 1983 and the ACRA. Summary judgment is appropriate.

### III.    Individual Capacity Claims

Hall does not allege individual-capacity claims against Sheriff Higgins. "When a plaintiff's complaint does not specify whether a defendant is being sued in his individual or official capacity, the court will interpret the claim(s) against that defendant as including only official capacity claims. *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619 (8th Cir. 1995). This pleading requirement is strictly enforced by the Eighth Circuit. *See Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997).

Even assuming Hall alleges individual-capacity claims against Sheriff Higgins, individual actors are entitled to qualified immunity from § 1983 claims "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457, U.S. 800, 818 (1982). Qualified immunity claims are analyzed under a two-step sequence:  "First, a court must decide whether the facts plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied the first step, the court must decide whether the right at issue was 'clearly established' at the time the of defendant's alleged misconduct." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court should determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Clemmons v. Armontrout*, 477 F.3d 962, 965 (8th Cir. 2007).

To establish a claim of personal liability, Hall must "allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007). Hall's Amended Complaint does not allege that Higgins had any personal involvement with Hall during Hall's incarceration at the PCRDF. In Higgins's deposition, he stated that he does not know Hall and never had any conversation with him. Higgins Deposition, p. 9. Higgins's general responsibilities as the Pulaski County Sheriff are insufficient to establish direct responsibility for the deprivation of Plaintiff's civil rights. *See Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987).

Hall cannot show that Higgins personally participated in any of the medical care or provision of services he received at PCRDF. Assuming that Hall's Amended Complaint alleges claims against Higgins in his individual capacity, Higgins is entitled to qualified immunity from those claims. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982).

**IV.    Disability Claims**

Hall makes several claims under the ADA, 42 U.S.C. § 12101 *et seq.*, and the ACRA, Ark. Code Ann. § 16-123-107. Disability claims presented under ACRA and the ADA are analyzed

using the same standard. *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) ("[W]e analyze a disability claim presented under the ACRA using the same principles employed in analyzing claims under the [ADA].") "Title II [of the ADA] provides disabled individuals redress for discrimination by a 'public entity.'" *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (citing 42 U.S.C. § 12132). For a prima facie Title II ADA violation, a qualified individual with a disability must be excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or be otherwise discriminated against by the entity, by reason of the individual's disability. *Folkerts v. City of Waverly*, 707 F.3d 975, 983 (8th Cir. 2013). Individuals cannot be sued under Title II of the ADA. *Alsbrook*, 184 F.3d at 1016 n. 8. Thus, Hall's only viable claims under the ADA must be against Higgins in his official capacity.

It is not clear from Hall's Amended Complaint which claims he is asserting under the ADA and ACRA. The Amended Complaint makes several allegations concerning the medical treatment he received at the PCRDF. Hall alleges that he developed pressure sores because he was not turned and did not receive skin audits. ECF 4, Am. Compl. at ¶ 6. Hall alleges that he developed a bladder infection and an infection surrounding his stoma because he did not receive "appropriate medical services." *Id*. at ¶ 10. To the extent Hall is asserting these allegations as claims under the ADA, they must be dismissed. The Eighth Circuit has repeatedly held that claims under the ADA or Rehabilitation Act cannot be based on "medical treatment decisions." *See, e.g.*, *A.H. v. St. Louis Cty., Mo.*, 891 F.3d 721, 729 (8th Cir. 2018) ("Improper medical treatment claims may not be brought under the ADA or RA."); *Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014) (affirming the dismissal of "the claims against the medical doctors and [Correctional Medical Services], as those claims were based on medical treatment decisions—including not properly

diagnosing and treating [the plaintiff's] pernicious anemia—which cannot form the basis of a claim under the RA or the ADA").

Hall also alleges that the PCRDF "failed to provide [him] with appropriate accommodations and accessible toilets." ECF 4, Am. Compl. at ¶ 5. He claims he "fell because he was housed in an inaccessible cell and while in the shower." *Id*. at ¶ 6. It is undisputed that the PCRDF has accessible cells and showers. Arivette Affidavit ¶¶ 9, 11; Higgins Deposition, pp. 9-10 (stating that PCRDF has accessible cells and does everything it can for inmates "with special needs when they come into the facility"). PCRDF staff works with Turn Key to ensure that inmates with accessibility needs are given appropriate access in the facility. *Id*. at pp. 5-6. PCRDF maintains a policy of accommodating disabled inmates. PCSO Branch Directive D10-00040.

Hall was initially housed in U-Unit and then transferred to W-Unit at his request. Cell History Report; April 14, 2019 Medical Inmate Request Form. In his deposition, Hall states that he was initially housed in a cell without an accessible shower, but that he was moved at his request to a unit with a "handicap-accessible shower." Hall Deposition, Vol. 2, pp. 24-25; 39-40. However, it is undisputed that Hall's initial housing came with an accessible shower. Arivette Affidavit ¶¶ 9, 11. Indeed, throughout the entirety of Hall's detention at PCRDF, he was housed in a unit with an accessible shower.

On May 14, 2019, Hall complained he was having difficulty transferring to the shower chair in his shower. A PCRDF deputy met with Hall and provided Hall a different shower chair so that it would be easier for Hall to transfer while showering. Hall states the deputies that helped him obtain the new chair "stood around [him]" while he tested it out. Hall Deposition, Vol. 2, pp. 72-73. "[T]hat [shower chair] had two rails and I was able to hold my hand on both sides and stabilize myself. It worked well." Hall Deposition, Vol. 2, p. 73.

With respect to Hall's allegations related to handicap-accessible toilets, it is true that during a portion of Hall's detention at PCRDF (14 days of his approximate 40-day detention), Hall did not have access to handicap-accessible toilets. The record demonstrates, however, that Hall did not use toileting facilities. Hall is incontinent of both bowel and bladder and uses a catheter and ostomy bag and diapers. As such, a handicap-accessible toilet was not necessary for Hall. Further, due to his use of a catheter, ostomy bag, and diaper, it was reasonable to assume Hall did not use toilet facilities.

Hall also alleges that he was "required . . . to use a 'one size fits all' manual wheelchair with no cushion." ECF 4, Am. Compl. at ¶ 11. The wheelchair he was provided in the PCRDF was "the same kind" as the wheelchair he was in when he arrived to the PCRDF. Hall Deposition, Vol. 2, p. 34. It was a manual wheelchair with "a leather or vinyl seat." *Id.* at p. 36. There is no evidence that this wheelchair did not meet Hall's needs. Further, while jail facilities are required to provide reasonable accommodations, they are not required to provide accommodations that are "unduly burdensome" to the facility. *Mason v. Correctional Medical Services, Inc.*, 559 F.3d 880, 886-88 (8th Cir. 2009). As Hall testified, his prescription electric wheelchair weighs over 350 pounds and requires a lift van for transportation. PCRDF is set up to accommodate manual wheelchairs. To provide electric wheelchairs, PCRDF would have to provide charging stations in secure areas of the facility, a manual wheelchair when the electric wheelchair was charging, a manual wheelchair when the inmate needed to shower, a van with the capabilities to transport the electric wheelchair, and staff to address all of the above issues. Provision of Hall's prescription electric wheelchair would have been unduly burdensome to PCRDF, particularly in light of the fact that the manual wheelchair provided was sufficient for Hall's needs. While the electric wheelchair may have been Hall's preferred accommodation, the ADA does not require that accommodations provided be the

inmate's ideal or preferred accommodation. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (8th Cir. 2011); *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007).

Hall cannot prove that he was discriminated against on the basis of his disability. Summary judgment is therefore appropriate on Hall's official-capacity ADA and ACRA claims.

## CONCLUSION

For the foregoing reasons, Defendant Eric S. Higgins requests that the Court award him summary judgment and dismiss all claims against him.

Respectfully submitted,

David M. Fuqua
Ark. Bar No. 80048
E-mail: dfuqua@fc-lawyers.com

Annie Depper
Ark. Bar No. 2009267
E-mail: adepper@fc-lawyers.com

Chris Stevens
Ark. Bar No. 2012289
E-mail: cstevens@fc-lawyers.com

**Fuqua Campbell, P.A.**
Attorneys at Law
3700 Cantrell Road, Suite 205
Little Rock, Arkansas 72202
501-374-0200

*Attorneys for Defendant Eric S. Higgins*